# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 13-cr-583 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| WALTER THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Currently before the Court is Defendant's affidavit [88], which the Court construes as a motion to present an entrapment defense to a jury. For the reasons that follow, the Court grants Defendant's motion [88] and concludes that Defendant is entitled to present an entrapment defense to a jury. This case is set for further status hearing on June 27, 2017, at 9:45 a.m.

## I. Background

Defendant Walter Thompson was indicted in 2013 for three counts of knowingly and intentionally distributing a controlled substance, namely 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 841(a)(1). [1.] Defendant seeks to present an entrapment defense to a jury. [88.] Defendant has submitted an affidavit as a proffer of evidence supporting an entrapment defense. The Government has not filed a written response, but has indicated that it would be appropriate for the Court to examine Defendant's affidavit and the pertinent case law in order to assess the viability of the proposed defense.

In his affidavit, Defendant details his interactions with Confidential Informant Allen "Big Al" Falls, Jr over several years. Defendant asserts that he first met Big Al in 1993 in Stateville

Correctional Center. [88, at ¶ 5.] According to Defendant, Big Al is a violent, very powerful, high ranking gang leader of the Gangster Disciples who has been convicted of murdering police officer Michael Ridges and conspiring to murder Larry Fischer. [*Id.* at ¶¶ 6–7.] Defendant contends that he had several violent encounters with Big Al while incarcerated. First, Defendant contends that in 1993, Big Al accused him of being "soft" for cleaning to earn good time credits and of disrespecting him by letting water drip down to a certain area, and he had Defendant beaten by other members of the Gangster Disciples. [*Id.* at ¶ 8.] Second, a day or two later, Big Al allegedly gave Defendant some marijuana and alcohol while he was injured and then molested and assaulted him. [*Id.*] Third, in 1997 or 1998, while Defendant was imprisoned at Menard Correctional Center, Big Al allegedly had Defendant violently beaten by another gang member. [*Id.* at ¶ 9.] Defendant contends that Big Al did so because Defendant questioned the monetary activities of another gang member. Big Al allegedly let Plaintiff know that "he had reach beyond the prison to do anything, and that he had ordered the killing of three people on the outside of prison," and "that he could arrange for the murder of [Defendant's] whole family." [*Id.*]

Big Al allegedly started soliciting Defendant to sell drugs about twelve years later. Defendant alleges that in 2010, at a picnic for former Stateville prisoners on Chicago's South Side, Big Al initially suggested that Defendant sell him guns and drugs and asked if he knew anyone selling. Defendant contends that Big Al gave him some marijuana for free to "make sure [Defendant] stay[ed] in tune with him," which Defendant understood to mean "[buy] some pounds of weed from him." Defendant asserts that he did not follow up on Big Al's offer. [*Id.* at ¶ 11.] In an attempt to convince Defendant to sell drugs, Big Al allegedly stated that he had received $150,000 and a new car as soon as he was released from prison. Defendant asserts that

2

Big Al told him that he knew Defendant was "messed up money wise" and knew that Defendant "had been trying to do positive things." Big Al allegedly promised to introduce Defendant to "people in St. Louis that had millions of dollars" and told Defendant that he could "fund anything or buy any amount of drugs and guns." [*Id.* at ¶ 12.] Defendant contends that he ignored Big Al at first because he did not want to be involved in selling drugs. [*Id.* at ¶ 13.]

However, Defendant alleges that Big Al called him more than thirty times, even after Defendant switched phone numbers because he thought that getting involved with Big Al "would lead to death, dealing with major drugs, and tough jail time." [*Id.* at ¶ 14.] Big Al allegedly asked Defendant to attend a Gangster Disciples and Black Disciples picnic, but Defendant asserts that he did not attend the event because Big Al knew that he had money problems and would continue to offer him money and to pressure him to sell drugs. [*Id.* at ¶ 15.] Defendant contends that it became "harder and harder to avoid" Big Al and that in 2010 or 2011, he saw Big Al at clubs and events. [*Id.* at ¶ 16.]

On January 21, 2011, Big Al allegedly approached Defendant again and asked him to provide guns and drugs. According to Defendant, Big Al "claimed that his brother or brother-in-law was a Federal or DEA Agent, and the Feds were watching [Defendant's] little brother, Jewneus, and [Defendant], and that his Federal agent brother could protect [Defendant] from being arrested or prosecuted." Big Al allegedly gave Defendant "some weed and about $800.00 and told [him] 'happy B-day.'" Defendant contends that Big Al said to "make sure" to get drugs for him if he wanted to "get on [his] feet," which Defendant understood to mean become financially stable. [*Id.* at ¶ 17.] Big Al allegedly told Defendant to connect with him at the club, but Defendant asserts that he did not want to sell drugs, so he refused, yet again, to contact Big Al. [*Id.* at ¶¶ 17–18.] Defendant contends that Big Al persisted and kept trying to contact him

through "a mutual associate from the West Side of Chicago" that Defendant knows as "L'il Larry" McGee and that Big Al "came with [McGee] to find [him] near a place that [Defendant] used to stay." [*Id.* at ¶ 20.]

Defendant alleges that he feared for his safety because he knew that Big Al was powerful and connected with the Gangster Disciples Street Gang, had been convicted of killing Officer Ridges and conspiring to kill Fischer, and because Big Al had caused Defendant to be severely beaten twice and had sexually molested him while he was in prison. Defendant further alleges that he felt that if he did not sell drugs to Big Al, he would be beaten or possibly killed. Defendant explains that he "felt this to be true because [he has] always known [Big Al] to be a very dangerous person who you cannot say no to," and because Big Al had loaned him money and wanted to be repaid by Defendant selling drugs to Big Al to "show [his] appreciation and respect." Defendant contends that he finally agreed to sell drugs to Big Al because he knew this would avoid harm to him and his loved ones. [*Id.* at ¶¶ 21–24.]

## II. Legal Standard

"Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014) (en banc). Entrapment is "generally a jury question, and the government must prove predisposition or the lack of government inducement beyond a reasonable doubt in order to defeat it." *United States v. Blitch*, 773 F.3d 837, 844 (7th Cir. 2014), as amended on denial of reh'g and reh'g en banc (Jan. 27, 2015). Thus, a defendant is entitled to present the defense of entrapment to the jury if the evidence is such that a rational jury could infer that Defendant was entrapped into committing the crime. *Id.*; see also *United States v. Evans*, 924 F.2d 714, 716

(7th Cir. 1991) (citing *Mathews v. United States*, 485 U.S. 58, 63 (1988)).  When the issue of entrapment is raised before trial, the court must accept the defendant's factual proffer as true. *Mayfield*, 771 F.3d at 420.  To obtain a jury instruction on entrapment and shift the burden of disproving entrapment to the government, the defendant must proffer evidence on both elements of the defense: inducement and lack of predisposition.  *Id.* at 440.  However, this initial burden of production is "not great," and an entrapment instruction is warranted if the defendant proffers "some evidence" that the government induced him to commit the crime and he was not predisposed to commit it.  *Id.*  In other words, "[a]lthough more than a scintilla of evidence of entrapment is needed before instruction on the defense becomes necessary, the defendant need only point to evidence in the record that would allow a rational jury to conclude that he was entrapped."  *United States v. McGill*, 754 F.3d 452, 457 (7th Cir. 2014).

The defense of entrapment requires the defendant to prove that he was (1) induced by someone working for or on behalf of the government to commit a crime that (2) he was not predisposed to commit.  *Evans*, 924 F.2d at 716.  In *Mayfield*, the Seventh Circuit clarified that the two elements of the entrapment defense are "conceptually related but formally and temporally distinct" and resolved "some conflicting strains in [Seventh Circuit] caselaw about the relationship between them."  771 F.3d at 420.  Inducement means "more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement."  *Id.* at 434.  Rather, "inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id.* at 434–35.  The "other conduct" used to induce may include "repeated attempts at persuasion,

5

fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who would not commit the crime if left alone will do so in response to the government's offers." *Id.* at 435.

Turning to the second element of entrapment—a lack of predisposition—a defendant is predisposed to commit the charged crime "if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." *Id.* at 438; see also *Jacobsen v. United States*, 503 U.S. 540, 553–54 (1992) (entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law."). Predisposition is measured at the time the government first proposed the crime. *Mayfield*, 771 F.3d at 438. Evidence of the defendant's reluctance to commit the crime is an importance consideration when evaluating predisposition. *Id.* at 437. "A prior conviction for a similar offense is relevant but not conclusive evidence of predisposition." *Id.* Finally, the two elements of entrapment are related in the sense that inducement is "evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994).

This doctrine follows from the animating principles of the entrapment doctrine. See *Mayfield*, 771 F.3d at 436. The purpose of the doctrine of entrapment is to prevent the police from turning a law-abiding person into a criminal. *Evans*, 924 F.2d at 717. A legitimate sting operation takes an actual criminal off the streets and thus reduces the crime rate. 771 F.3d at 436. The entrapment defense guards against the government overreaching, "reflect[ing] the view

6

that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *Hollingsworth*, 27 F.3d at 1230. When a government agent tempts a person to commit a crime that he would not otherwise have committed, "punishing him will not reduce the crime rate; it will merely deflect law enforcement into the sterile channel of causing criminal activity and then prosecuting the same activity." *United States v. Manzella*, 791 F.2d 1263, 1269 (7th Cir. 1986).

## III. Analysis

In applying this controlling law to the case at hand, the Court must accept as true the facts proffered in Defendant's affidavit supporting his motion to present an entrapment defense to a jury [88]. See *Mayfield*, 771 F.3d at 420. The Court concludes that drawing all reasonable inferences in Defendant's favor, he has proffered enough evidence to demonstrate the existence of an entrapment issue for trial. First, Defendant's affidavit contains sufficient evidence from which a reasonable jury could conclude that the government induced him to sell drugs. Big Al targeted Defendant during a time of financial need, telling Defendant that he knew Defendant was "messed up money wise" and to "make sure" to get drugs to sell to Big Al if he wanted to "get on [his] feet" and become financially stable. See *Mayfield*, 771 F.3d at 441 (holding that reasonable jury could find inducement where, among other tactics, informant targeted defendant "at a moment of acute financial need"). Additionally, Defendant's affidavit provides evidence from which a reasonable jury could determine that Big Al preyed on Defendant's financial struggles by promising rewards "beyond that inherent in the customary execution of the crime." *Id.* at 435. Defendant asserts that in an attempt to convince Defendant to sell drugs, Big Al stated that he had received $150,000 and a new car as soon as he was released from prison, promised to introduce Defendant to "people in St. Louis that had millions of dollars" and told

7

Defendant that he could "fund anything or buy any amount of drugs and guns." See *Evans*, 924 F.2d at 717 (if a person is induced to commit a crime by extraordinary promises,"the sorts of promises that would blind the ordinary person to his legal duties," then the defense of entrapment applies).

A reasonable jury also could infer that when propositioning Defendant to sell drugs, Big Al appealed to their "common struggle as convicted felons" by approaching Defendant at a picnic for former Stateville prisoners in 2010 and later inviting him to a Gangster Disciple and Black Disciples picnic celebration. "Appeals of this sort are among the oldest tactics recognized as forms of government inducement." *Mayfield*, 771 F.3d at 441 (holding that reasonable jury could find inducement where, among other tactics, informant appealed to defendant's "friendship and camaraderie and to their common struggle as convicted felons trying to make a living"); see also *Sherman v. United States*, 356 U.S. 369, 371 (1958) (concluding that there was entrapment as a matter of law even though defendant was offered little more than reimbursement for his costs if he would obtain heroin because the inducement consisted of repeated requests from an informant posing as a fellow recovering addict who had fallen off the wagon); *United States v. Sorrells*, 287 U.S. 435, 441 (1932) (holding that an entrapment instruction was warranted even though defendant was promised no extravagant profit because informant's persistent appeal to military camaraderie qualified as a potentially entrapping inducement). Further, Big Al made fraudulent representations by claiming that his brother was a "Federal or DEA Agent" who could protect Defendant from being arrested or prosecuted. Additionally, Big Al pestered Defendant over a substantial period of time, propositioning him in person at events, through over thirty telephone calls, and through at least one personal visit, from at least 2010 until 2011. See *United States v. Barta*, 776 F.3d 931, 937 (7th Cir. 2015) (the FBI's frequent emails and calls to

defendant, with no response from defendant, amounted to "repeated attempts at persuasion"); *Mayfield*, 771 F.3d at 420–21, 441–42 (where informant pestered defendant "over the course of several weeks," a reasonable jury could find that "this persistent pressure amounted to harassment").

Moreover, a reasonable jury could find that Big Al gave Defendant about $800 in order to create a debt that he knew Defendant would have trouble repaying and then exploited that debt to induce Defendant to sell drugs. This debt was created against the backdrop of Big Al's violent history, Defendant's experience of being beaten and molested because of Big Al, and Big Al's remarks to Defendant in 1997 or 1998 that he had "ordered the killing of three people on the outside of prison" and "that he could arrange for the murder of [Defendant's] whole family." Drawing all inferences in favor of Defendant, as the Court must, a reasonable jury could conclude that Big Al's decision to give Defendant money—combined with his history of violence, his repeated propositions, an invitation to a gang event, and his personal visit to where Defendant was staying—was calculated to convey an implied threat of violence if the debt was not repaid. See *Mayfield*, 771 F.3d at 441 (holding that reasonable jury could find inducement where, among other tactics, informant "gave [defendant] money in order to create a debt he knew [defendant] would be unable to repay and then exploited that debt by alluding to his status as a member of the Gangster Disciples," which was arguably an implied threat of violence if the debt was not repaid). In short, considering the cumulative effect of these tactics, Defendant has proffered enough evidence from which a reasonable jury could conclude that the government induced Defendant to sell drugs.

Turning to predisposition, Defendant also has proffered enough evidence to permit a rational jury to find reasonable doubt about Defendant's predisposition to sell drugs at the time

Big Al first approached him at the 2010 picnic. Defendant repeatedly rejected Big Al's entreaties from at least 2010 to 2011, going so far as to change his phone number to avoid Big Al's phone calls. Defendant contends that he initially ignored Big Al because "he did not want to be involved in selling drugs" and he thought that getting involved with Big Al "would lead to death, dealing with major drugs, and tough jail time," and that he relented in the end only because he feared for his safety. Accepting Defendant's affidavit as true, Defendant's initial reluctance and continued resistance is substantive evidence that he was not predisposed to commit the crime when Big Al first proposed it. See *Mayfield*, 771 F.3d at 442 (defendant's initial reluctance and continued resistance was substantive evidence that he was not predisposed to commit the crime, even though defendant actively engaged in the scheme once the government had procured his participation).

In addition, although Defendant does have prior drug convictions, these prior convictions are not conclusive evidence of predisposition. *Mayfield*, 771 F.3d at 437. Defendant asserts that he has four felony convictions involving guns and two felony convictions involving drugs, and that his last drug conviction was in 1996 for possession of a controlled substance. Since his most recent drug conviction was a conviction for possession seventeen years before his current indictment for distribution, it is not enough to conclusively prove that Defendant was predisposed to selling drugs when Big Al first approached him in 2010. See *id.* at 442 (the fact that defendant committed a different kind of robbery in the past was not conclusive evidence that he was predisposed to commit a stash-house robbery when informant first proposed it); *Sherman*, 356 U.S. at 375 (concluding that a nine-year-old conviction for the sale of narcotics and a five-year-old conviction for possession of narcotics were insufficient to prove that petitioner had a readiness to sell narcotics at the time government informant approached him).

Finally, the Court notes that although Defendant does not proffer much evidence of rehabilitation, such as attempts to find honest work or join an antirecidivism program, for example, Defendant does assert that Big Al knew that Defendant "had been trying to do positive things." Thus, a reasonable jury could conclude that Defendant was not ready and willing to sell drugs or merely waiting for an opportunity to do so; in other words, he was not predisposed to commit the crime. See *Evans*, 924 F.2d at 717 ("[A] person is predisposed to crime in the sense that the ordinary profits of crime are incentive enough to him to commit crimes; he is ready and waiting; all that is wanting is the opportunity.")

Although the Court expressed no opinion on whether Defendant will be successful with an entrapment defense, as the inferences to be drawn from the evidence and credibility determinations are ultimately for the jury, the Court concludes that Defendant has proffered enough evidence to show the existence of an entrapment issue for trial.

**IV.     Conclusion**

For the foregoing reasons, the Court grants Defendant's motion [88] and concludes that Defendant is entitled to present an entrapment defense to a jury.

Date: June 12, 2017

_____
Robert M. Dow, Jr.
United States District Judge